**WASHINGTON RESEARCH PROJECT, INC., Plaintiff,**

v.

**DEPARTMENT OF HEALTH, EDUCATION AND WELFARE and Casper W. Weinberger, Defendants.**

**Civ. A. No. 1279-73.**

United States District Court, District of Columbia.

Nov. 6, 1973.

Michael B. Trister, William C. Smith, Washington, D. C., for plaintiff.

Michael Ryan, Asst. U. S. Atty., Washington, D. C., for defendants.

## MEMORANDUM OPINION

GESELL, District Judge.

Plaintiff invokes the Freedom of Information Act, 5 U.S.C. § 552, and seeks to compel production of certain records from the Department of Health, Education and Welfare and one of its constituent agencies, the National Institute of Mental Health (NIMH). An injunction and declaratory judgment are sought. Plaintiff's written request for production, inspection and copying of specified records has been fully processed through appropriate administrative channels and the issues are accordingly properly before the Court, which has jurisdiction under 5 U.S.C. § 552(a)(3).

On April 13, 1973, plaintiff requested, with detailed specification, documents relating to eleven designated research grants by the Psychopharmacology Research Branch of NIMH for studies on the drug treatment of children with learning difficulties or behavioral disorders, particularly hyperkinesis. All but two of the research grants involve the use of one or a combination of stimulant or anti-depressant drugs, including methylphenidate (Ritalin), dextroamphetamine, thioridazine and imipramine, on selected school age and/or pre-school children.

All of the grants are administered by public or private non-profit educational, medical or research institutions. None of the grants is concerned with the production or marketing of the drugs being tested. Their purposes include the determination of optimal dosage levels and treatment schedules; the identification of possible harmful side effects such as drug addiction and loss of weight; the

measurement of the effect of different drugs on learning, including the existence of state-dependent learning; and the development of improved assessment techniques to measure the efficacy of drug treatment on children.

Following a series of conferences and administrative actions, which need not be reviewed here in any detail, a considerable number of documents were furnished. However, as of July 27, 1973, the following categories of documents were still being withheld, and it is upon these that the litigation has finally focused:

    (a) with regard to previously approved grant applications, the narrative statement and any related exhibits describing in detail the research plan to be followed (sometimes referred to as the research protocol or research design);

    (b) with regard to previously approved continuation, renewal or supplemental applications, the comprehensive progress reports describing the results and accomplishments of the projects since the last such report;

    (c) the entire text of all site visit reports and "pink sheets" prepared by outside consultants and NIMH staff during the agency review of the applications;

    (d) the entire text of all continuation and renewal applications which have not yet been approved.

For the purposes of analysis, these various documents will be referred to simply as grant applications, site visit reports, and "pink sheets."

After some discovery, the matter came before the Court for final hearing under an arrangement developed at a status conference. The parties presented *in camera* a portion of a single grant file marked to show the type of information defendant believes may properly be withheld under the Act. This file, as marked, was also given plaintiff informally. It was agreed that the determinations made by the Court based on this example would control the disposition as to other similar material covered by plaintiff's request and presently withheld. After the record was completed, the parties presented argument and were allowed to file post-trial briefs.

## I. NIMH GRANT PROCEDURES

Before turning to the conflicting interpretations of the Freedom of Information Act presented by the parties, the nature of the material requested must be elaborated and its significance in the chain of the grant process explained.[1]

The National Institute of Mental Health operates a dual system of review for all major research projects. The first stage involves the initial review group (sometimes called a study section or review committee), made up of from 10–20 nongovernmental technical consultants, who are appointed by the Director of NIMH for overlapping terms of up to four years. Each branch or center of the NIMH is served by one or more review groups qualified in a specific field. There are approximately 20 NIMH review groups for research project grants, as well as review groups for long-term program grants, small grants, fellowships and training. There is an Executive Secretary for each review group who is an NIMH employee and a chairman who is appointed by the Executive Secretary.

Each application is assigned by the Executive Secretary to one or more members (assignees) of the initial review group for study and comment. Assignees are selected because of their experience and competence in the areas covered by the proposed research. Noncommittee members may also be asked to review a project on an *ad hoc* basis, when the Executive Secretary feels that

---

1. The following textual description of the NIMH grant review process is taken principally from the deposition of Dr. Ronald S. Lipman, Chief of the Clinical Studies Section of the Psychopharmacology Research Branch of NIMH and from the *NIMH Handbook for Initial Review Staff* (1970), plaintiff's exhibit 1 in evidence.

the committee itself lacks expertise in a necessary area.

When additional information is needed, the Executive Secretary may obtain it through correspondence, by telephone, or by a site visit conducted by the review group assignees. Site visits may also be requested by the assignees themselves when they believe it will aid in their review of the project. Site visits are generally used for unusually large or multidisciplinary applications, or when it is deemed important to meet personally with the investigator and his or her associates in order to observe the physical facilities and equipment which will be used or to observe a particular experimental technique in operation. Visitors may make suggestions for changes in the proposed research plan, and a revised protocol or addendum is sometimes submitted to NIMH following the site visit.

At the conclusion of the site visit, the team meets in executive session to discuss their reactions and to formulate a recommendation. One assignee is delegated to write up the team's findings, sometimes with the assistance of written reports from the other visitors. The site visit reports are prepared on behalf of the team as a whole and they do not identify evaluations with particular members of the site visit team.

The site visit report or, when no site visit was held, a written evaluation prepared by one of the assignees is made part of a grant book which is sent to each member of the initial review group four to six weeks before its meeting. The grant book also contains a copy of the complete grant application for each project which is scheduled to be reviewed.

Initial review groups meet three times a year. The Clinical Psychopharmacology Research Review Committee, which reviewed the grants involved here, considers an average of ten to fifteen applications at each meeting, including supplemental and renewal applications.[2] Each proposed research project is reviewed separately for approximately 45 minutes to an hour. The principal assignee describes the project and presents the findings of the site team visit. The other visitors also present a critique of the project, and NIMH staff may be asked to comment.

Following the discussion and after a consensus has been reached, a formal vote is taken on each project. If it is approved, each member of the committee then assigns a rating to the project, which is used for determining funding priorities. The minutes of each meeting contain a complete attendance list and data on the number of approvals, disapprovals and deferrals of applications considered, but they do not contain a summary of the discussion regarding any application.

After the meeting of the initial review group, an NIMH staff person prepares a Summary Statement ("pink sheet") for each grant, containing in a single document a brief description of the proposed research or training grant request and the substantive considerations that led to the specific recommendation, including in the case of a split vote the reasons for both majority and minority opinions. The Statement will normally discuss the background and competence of the investigators, any special aspects of the facilities and equipment, and whether the budget is appropriate to the aims and methodology of the project. Where human subjects are

---

2. Supplemental applications are for additional funds above the amount previously approved for the current or any future project year. Renewal applications are for funds beyond the project period previously approved. Continuation applications are filed at the beginning of each year in the previously approved project period. Generally, supple- mental and renewal applications must compete for available funds with other applications, new or otherwise; they are processed through both stages of the review process. Continuation applications are generally noncompeting and not subject to the review process.

involved, the Statement should include the opinion of the review group on the risks involved. In addition, the site visit report, if one has been written, is incorporated by reference into the Statement.

All Review Committee actions are considered to be collective and anonymous. Therefore, the Summary Statement does not attribute evaluations or comments to any individual member. If two or more members voted against the majority recommendation, their opinion is also summarized in the Statement, without identifying the members involved.

The Statements are the principal source of information regarding the application and the recommendation provided to the National Advisory Mental Health Council; they are also used by NIMH staff to provide information concerning disapprovals to applicants and to follow the results of approved projects. According to the NIMH Handbook, at 32, the Statements are "perhaps the most informative document in the history of the grant."

The second stage in the dual NIMH review process involves the National Advisory Mental Health Council, a body set up by statute to "advise, consult with, and make recommendations to, the [Secretary] on matters relating to the activities and functions of the [Public Health] Service in the field of mental health." 42 U.S.C. § 218(c). The Council is specifically authorized "to review research projects or programs submitted to or initiated by it in the field of mental health and recommend to the [Secretary] . . . any such projects which it believes show promise of making valuable contributions to human knowledge with respect to the cause, prevention, or methods of diagnosis and treatment of psychiatric disorders." 42 U.S.C. § 218(c). The members of the Council are the Assistant Secretary for Health, the Chief Medical Officer of the Veterans' Administration, a medical officer designated by the Secretary of Defense, and twelve public members appointed by the Secretary of HEW.

The National Advisory Mental Health Council meets three times a year for two or three days to review the "recommendations" of all of the initial review groups within NIMH. The Council reviews from 500 to 1,000 grants during each meeting. Except where a special request is made, the Council members do not receive individual grant applications. Their decision is based solely on the review group Summary Statements. Except for grants on which a special question is raised (no more than five percent of the grants), the Council approves the recommendations from each review group in a block. Consequently, the Council's concern is with questions of general policy and of program priority, and not with the scientific merit of the individual applications.

Following approval by the National Advisory Mental Health Council, funding of a project is contingent upon the availability of funds. General priorities for funding are determined by the Director of NIMH, with the advice of the National Advisory Mental Health Council. Within these general priorities, 90 percent of the approved grants are funded in the order of numerical priority set by the initial review group. Researchers are notified of the grant award by an award letter and a formal notice, both of which are signed by the NIMH branch chief. The award letter states that the project has been approved by the initial review group and the National Advisory Mental Health Council.

## II. THE ACT

These procedures generate a prodigious amount of information concerning the proposed research projects and the allocation of funds among them. NIMH incorporates into its application instructions a warning that some of this information must be made available to the public under the Freedom of Information Act. However, it specifically assures the applicants that the following information does not fall within the

terms of the Act and will not be disclosed to the public:

    a. Applications for research grant support are considered to be privileged information. Until such time as an application is approved and a grant awarded, no information is disclosed except for the use of Section I of the application form PHS–398 and the notice of research project form PHS–166 by the Science Information Exchange in connection with its responsibilties for exchange of information among participating agencies.

    b. Section II of the application form PHS–398 or the corresponding material in application form PHS–2590.

    c. Details of estimated budgets.

    d. Discussions of applications by advisory bodies.[3]

Plaintiff challenges this interpretation of the Act and NIMH's consequent withholding of substantial portions of the grant applications, "pink sheets," and site visit reports requested.

█ In resolving this dispute, the Court is faced with the initial difficulty that the Act on its face does not give special consideration to the field of medical research or the problem of grant applications. Accordingly, as is usually the case where the Court must attempt to apply this imprecise and poorly drafted statute to a situation apparently never contemplated by the Congress, it becomes necessary to resolve the controversy by reliance on the high gloss which the learned decisions of this Circuit have been required to place on the legislation.

█ The initial question for consideration is whether the "pink sheets," site visit reports and grant applications are documents coming within the disclosure provisions of § 552(a). Under the decisions in this Circuit, it is clear that the NIMH initial review groups constitute "agencies" as that term is used in the Act. *See, e. g.,* Grumman Aircraft Engineering Corp. v. Renegotiation Bd., 482 F.2d 710 (D.C.Cir.1973) ("Grumman II"). They "serve as a discrete, decision-producing layer" in the application process and the priorities they set receive only perfunctory review by the National Advisory Mental Health Council. *Id.* at 715. It is equally clear—indeed not contested—that the "pink sheets" represent the final opinions of the initial review groups, presenting authoritative reasons for assigning each application to a particular priority. The site visit reports must be viewed as integral parts of these final decisions, since, as indicated by the sample file, they are incorporated by reference into the "pink sheets" and are cited as a basis for the review groups' final decisions. *See* Sterling Drug, Inc. v. F.T.C., 146 U.S.App.D.C. 237, 450 F.2d 698, 704–708 (1971); American Mail Line, Ltd. v. Gulick, 133 U.S.App.D.C. 382, 411 F.2d 696, 703 (1968). Both types of documents are therefore subject to disclosure as an agency's "final opinions . . . made in the adjudication of cases . . ." 5 U.S.C. § 552(a)(2)(A). As for the grant applications, they are "identifiable records" of an agency and are therefore subject to disclosure upon specific request, which plaintiff has duly made. *See* 5 U.S.C. § 552(a)(3); Bristol-Myers Co. v. F.T.C., 284 F.Supp. 745, 747 (D.D.C. 1968).

█ All of the documents sought by plaintiff must therefore be produced in full unless the Government can establish that certain papers or sections thereof fall within the specific exemptions enumerated in the Act. Defendants suggest that three of these exceptions are applicable to the documents at issue. In considering this claim, the Court must construe the requirement of disclosure broadly and the exemptions narrowly in

---

**3.** National Institutes of Health, *Grant for Research Projects, Policy Statement* 14 (1972). This interpretation of the Act is consistent with HEW's more general interpretation, codified at 45 C.F.R. § 5.

order to promote "the clear legislative intent to assure public access to all government records whose disclosure would not significantly harm specific governmental interests." Soucie v. David, 145 U.S.App.D.C. 144, 448 F.2d 1067, 1080 (1971).

■■ Defendants argue that all description of an applicant's proposed research, whether in its application or in agency reports, constitutes confidential material within the terms of the fourth exemption.[4] However, that exemption shields only trade secrets and other confidential information that is either "commercial" or "financial" in nature. Getman v. N.L.R.B., 146 U.S.App.D.C. 209, 450 F.2d 670, 673 (1971). None of the applicants for NIMH grant funds are profit-making enterprises, nor are such funds sought for the production or marketing of a product or service.[5] Whatever Congress may have meant by the admittedly imprecise terms in the fourth exemption, the Court cannot, consistent with its duty to construe the Act's exemptions narrowly, find that sci-

entific research procedures to be undertaken by non-profit educational or medical institutions fall within those terms.[6] Even if the Court were to find otherwise, however, defendants would not prevail, for they have wholly failed to meet their burden of proving that the particular research designs and protocols at issue in this case contain material that would normally be kept confidential by the researchers themselves, regardless of the agency's own assurances of confidentiality. See Sterling Drug, Inc. v. F.T.C., supra, 450 F.2d at 709.

■ Defendants also raise the fifth exemption,[7] which shields inter- and intra-agency memoranda. However, this Court's finding that the "pink sheets" and site visit reports constitute final agency opinions takes those documents out of the fifth exemption, see Grumman II, supra, 482 F.2d at 716–717, and the applications are not protected because they were written by non-agency personnel, see Note, The Freedom of Information Act and the Exemption for Intra-Agency Memoranda, 86 Harv.L.

4. 5 U.S.C. § 552(b)(4): "This section does not apply to matters that are . . . trade secrets and commercial or financial information obtained from a person and privileged or confidential . . . ."

5. In recent testimony before Congress, Dr. John F. Sherman, Deputy Director of the National Institutes of Health, argued that the fourth exemption should apply to grant documents because "to the scientist and to the research clinician, research designs and protocols are regarded and treated as proprietary information, just as trade secrets are protected by the commercial and industrial sector." Hearings on U.S. Government Information Policies and Practices Before a Subcomm. of the House Comm. on Government Operations, 92d Cong., 2d Sess. 3620 (1972). However, this analysis is only relevant to the extent that Dr. Sherman recognizes that research procedures are not actually trade secrets, nor are researchers part of the "commercial or industrial sector." His argument for exemption by analogy cannot be adopted in light of the requirement that exemptions be interpreted narrowly.

6. The Attorney General's Memorandum on the Public Information Section of the Administrative Procedure Act (1967), at 34,

apparently reached a contrary conclusion, based upon comments in the congressional reports to the effect that "technical data" concerning "scientific or manufacturing processes" would be covered by the fourth exemption. However, Professor Davis points out that the quoted language was derived from a Senate report on an earlier version of the exemption which did not contain the limiting words "commercial or financial," and that the shielding of non-commercial technical information would be contrary to the clear wording of the statute. K. Davis, The Information Act: A Preliminary Analysis, 34 U.Chi.L.Rev. 761, 789–91 (1967). In resolving this dispute in Davis' favor, the Court finds it significant that the D.C. Circuit in Getman followed Davis and interpreted the fourth exemption narrowly (although it did not specifically consider the disputed language in the congressional reports), while the Attorney General's Memorandum interpreted it broadly to cover all confidential material.

7. 5 U.S.C. § 552(b)(5): "This section does not apply to matters that are . . . inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency . . . ."

Rev. 1047, 1063–66 (1973), and contain essentially factual material, *see* Bristol-Myers Company v. F.T.C., 138 U.S.App. D.C. 22, 424 F.2d 935, 939, cert. denied, 400 U.S. 824, 91 S.Ct. 46, 27 L.Ed.2d 52 (1970).

■ Similarly, there is no merit to defendants' claim that the disclosure of any agency reference to the professional qualifications or competence of a particular researcher would constitute a clearly unwarranted invasion of personal privacy under the sixth exemption.[8] That provision shields only "personnel and medical files and similar files" from disclosure. Although the term "files" has been justifiably criticized as vague, *see* K. Davis, *supra* note 4, at 798, it cannot be ignored.[9] The sixth exemption was intended to protect "detailed Government records on an individual," H.Rep. 1497, 89th Cong., 2d Sess. 11 (1966), U.S.Code Cong. & Admin.News, p. 2428, and it cannot be extended to shield a brief analysis of professional competence written into a final agency opinion.

■ Perhaps in recognition of this distinction, Congress incorporated another privacy provision into the Act which is not limited to Government files. Immediately following the disclosure requirement in § 552(a)(2), the Act states: "To the extent required to prevent a clearly unwarranted invasion of personal privacy, an agency may delete identifying details when it makes available or publishes an opinion, statement of policy, interpretation, or staff manual or instruction. However, in each case the justification for the deletion shall be explained fully in writing." Portions of the "pink sheets" and the site visit reports could fall within the terms of this exemption, but the Government has the burden of establishing that disclosure in each instance would be "clearly unwarranted." *See* Getman v. N.L.R.B., *supra*, 450 F.2d at 674.

■ Upon careful consideration of the competing interests involved, the Court concludes that the Government may, to the extent described below, delete identifying details from statements of opinion concerning the professional qualifications or competence of particular individuals involved in the research project under consideration. Disclosure of such information might substantially injure the professional reputations of researchers, while deletion would not, in most instances, significantly obscure the reasons for assigning an application to a particular priority.

■ It must be stressed, however, that the holding of this Court is narrowly limited. Normally, only the names of the individuals under discussion may be deleted, leaving the opinions themselves free to be disclosed. Grumman Aircraft Engineering Corp. v. Renegotiation Bd., 138 U.S.App.D.C. 147, 425 F.2d 578, 580–81 (1970) ("Grumman I"). If, as is the case with many of the documents sought by plaintiff, the names of the researchers have already been disclosed or if for any other reason the deletion of such names would not conceal the identity of the individuals under discussion, the statements of opinion might have to be deleted in their entirety. But in every case the defendants may only delete that minimum amount of information necessary to conceal the identity of those individuals whose privacy is threatened in the manner described above.

■ As a further limitation, no deletions whatever may be made from documents relating to an application—whether initial, continuation, renewal or supplemental—which has actually been granted, since in such cases the public's interest in knowing how its funds are disbursed surpasses the privacy interests involved. Nor may the identity of an institutional applicant be concealed, be-

---

8. 5 U.S.C. § 552(b)(6): "This section does not apply to matters that are . . . personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy . . . ."

9. An earlier version of the sixth exemption shielded the specified files and all "similar *matter*" (emphasis added), but Congress amended that phrase to use the more limited term "files" throughout. K. Davis, *supra* note 4, at 798 n. 94.

cause the right of privacy envisioned in the Act is personal and cannot be claimed by a corporation or association. K. Davis, *supra* note 4, at 781, 799.

 Apart from resolution of the instant controversy, plaintiff asks for assistance to insure that subsequent similar requests for information from NIMH will not be delayed and obfuscated by drawn-out negotiations and Court proceedings. Plaintiff's concern is well taken, for the Act should, to the extent practical, be self-operative to insure prompt disclosure as contemplated by Congress. At a minimum, the defendants should promptly modify existing regulations and grant application instructions to bring them into conformity with the decision of this Court. It is particularly important that grant applicants be placed on notice that information submitted pursuant to an application for NIMH grant funds and final agency opinions concerning the award of such funds, as defined above, cannot normally be kept confidential nor withheld from the public.

The foregoing shall constitute the Court's findings of fact and conclusions of law.