**CONSUMERS UNION OF UNITED STATES, INC., Appellant,**

v.

**John G. HEIMANN, Individually and in his official capacity as Comptroller of the Currency.**

No. 77–2115.

United States Court of Appeals, District of Columbia Circuit.

Argued June 9, 1978.

Decided Aug. 31, 1978.

J. Skelly Wright, Chief Judge, concurred and filed opinion.

Mark A. Cymrot, Washington, D. C., with whom Ellen Broadman, Washington, D. C., was on the brief, for appellant.

Michael Kimmel, Atty., Dept. of Justice, Washington, D. C., with whom Earl J. Silbert, U. S. Atty., Barbara Allen Babcock, Asst. Atty. Gen., and Leonard Schaitman, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellee.

Charles E. Hill and Douglas L. Parker, Washington, D. C., were on the brief for amicus curiae, urging reversal.

Before WRIGHT, Chief Judge, and TAMM, Circuit Judge, and HOFFMAN,* United States Senior District Judge for the Eastern District of Virginia.

Opinion for the court filed by Circuit Judge, TAMM.

Concurring opinion filed by Chief Judge, J. SKELLY WRIGHT.

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. Memorandum Decision of Nov. 1, 1977, Joint Appendix (J.A.) at 72a–73a; see J.A. at 1a.

2. J.A. at 60a; Brief for the Appellee at 15–16. See generally 12 C.F.R. §§ 226.1–.15 (1977).

TAMM, Circuit Judge:

Appellant Consumers Union of United States, Inc., challenges an order of the United States District Court for the District of Columbia that granted summary judgment in a Freedom of Information Act (FOIA) suit to appellee Comptroller of the Currency (Comptroller). The district court (Pratt, J.) held that exemption 8 of the FOIA, 5 U.S.C. § 552(b)(8) (1976), protects from disclosure documents relating to the extent of compliance by certain national banks with the Consumer Credit Protection Act, 15 U.S.C. §§ 1601–1691f (1976), specifically those provisions known as the Truth in Lending Act, 15 U.S.C. §§ 1601–1667e (1976).[1] We agree with the district court that the documents at issue clearly fall within the express terms of the exemption, and thus we affirm.

I

Appellant is a nonprofit corporation chartered in 1936 to provide information, education, and counsel about consumer goods and services. In May 1976, it learned that a comprehensive examination of national banks in the New England region by the Comptroller had revealed a significant degree of noncompliance by those banks with regulations promulgated pursuant to the Truth in Lending Act.[2] That same month, appellant wrote to the Comptroller requesting access under the FOIA, to: "(1) documents submitted to the Comptroller's Office by national banks which concern the extent of their compliance with the Truth-in-Lending Act, and (2) any analysis or summary by the Office of the Comptroller of those documents."[3] The Comptroller denied the request on June 7, 1976, citing as authority for nondisclosure regulations of the Comptroller that incorporated exemptions 5 and 8 of the FOIA, 5 U.S.C. §§ 552(b)(5) & (8) (1976).[4] Appellant's administrative appeal was rejected on the authority of regulations

3. Record entry (R.E.) 10, exhibit (exh.) 1.

4. Id. exh. 2. See 12 C.F.R. § 4.16(b)(5) & (8) (1977).

that incorporated exemption 8, and, additionally, exemptions 4, 6, and 7 of the FOIA.[5]  *Id.* §§ 552(b)(4) & (6)–(7).

On August 17, 1976, appellant filed suit in the district court, arguing primarily that exemption 8 did not apply to the documents in question.[6]  The district court disagreed, and, on November 1, 1977, granted the Comptroller's motion for summary judgment.  This appeal ensued.[7]

## II

This case presents this court with its first opportunity to discuss exemption 8 of the FOIA,[8] which protects from disclosure those matters that are "contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions."  5 U.S.C. § 552(b)(8) (1976).

The Comptroller contends that the term "examination, operating, or condition reports" describes, and thus protects from disclosure, the documents in issue.  Appellant takes the opposite view, arguing: 1) the language of exemption 8 must be interpreted in a manner consistent with the legislative intent at the time of its enactment in 1966; 2) legislative history demonstrates that, at that time, the Congress intended to protect only examination reports that re-

flected upon the security and solvency of financial institutions; 3) "consumer bank examinations" did not come into being until 1968 at the earliest, when the Truth in Lending Act was passed, and do not reflect upon bank security or solvency; and 4) a narrow construction of exemption 8 does not permit its expansion to cover these new materials.[9]

▮ We are well aware of the fact that exemptions to the FOIA must be narrowly construed.  *Washington Research Project, Inc. v. Department of Health, Education and Welfare,* 164 U.S.App.D.C. 169, 175, 504 F.2d 238, 244, *cert. denied,* 421 U.S. 963 (1974);  *Soucie v. David,* 145 U.S.App.D.C. 144, 157, 448 F.2d 1067, 1080 (1971).  However, we are also mindful that a reviewing court must accord first priority in statutory interpretation to the plain meaning of the provision in question.  *Caminetti v. United States,* 242 U.S. 470, 485, 37 U.S. 192, 61 L.Ed. 442 (1917);  *accord, United States v. American Trucking Associations,* 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940).  Thus, if the Congress has intentionally and unambiguously crafted a particularly broad, all-inclusive definition, it is not our function, even in the FOIA context, to subvert that effort.  In our view, the wording of exemption 8 leaves no doubt that the documents in issue fit precisely and exactly within the statutory definition.

**5.** R.E. 10, exh. 5.  *See* 12 C.F.R. § 4.16(b)(4) & (6)–(7) (1977).

**6.** R.E. 32, at 2;  *see* J.A. at 1a.

**7.** Because of the result we reach concerning exemption 8, we find it unnecessary to address the Comptroller's other claims of exemption.  *See* Brief for the Appellee at 25–26 n.24.

**8.** Our research indicates that we may be the first appellate court to interpret exemption 8, although we did cite the exemption in *Soucie v. David,* 145 U.S.App.D.C. 144, 155, 448 F.2d 1067, 1078 n.45 (1971).  *See also Secretary of Labor v. Farino,* 490 F.2d 885, 893 n.8 (7th Cir. 1973);  *First Fed. Savings & Loan Ass'n v. Federal Home Loan Bank Bd.,* 426 F.Supp. 454, 458 (W.D.Ark.1977);  *Farmers Nat'l Bank v. Camp,* 345 F.Supp. 622, 627–28 n.7 (D.Md.1971).  Three district court cases have discussed the exemption to a limited degree, most recently *Gerard v. Carey,* Civil No. 76–259 (E.D.P.A. Mar. 21, 1978).  *Gerard* involved a discovery

request, and the court noted that a report by a bank regulatory body that would be exempt from disclosure to the public under the Freedom of Information Act might nevertheless be subject to discovery.  *Kaye v. Burns,* 411 F.Supp. 897 (S.D.N.Y.1976), held only that attorney's fees should not be assessed against an agency that refused disclosure, under exemption 8, of a letter, based on an examination report, that concluded statutory violations had occurred;  the court found that the agency had a reasonable basis in law for concluding that the item was exempt.  *Id.* at 904.  *M. A. Schapiro & Co. v. SEC,* 339 F.Supp. 467 (D.D.C. 1972), concluded that national securities exchanges and broker-dealers are not "financial institutions" under exemption 8, and that studies and documents relating to changing of trading rules are not bank examination reports.  *Id.* at 470.

**9.** *See* Reply Brief of Appellant at 3–5.

■ However, a court can look beyond the plain meaning of a statute in limited instances, most notably when there is an assertion of a significant change in circumstances since enactment, *see Perry v. Commerce Loan Co.*, 383 U.S. 392, 397–400, 86 S.Ct. 852, 15 L.Ed.2d 827 (1966), or when a literal reading leads to an unreasonable result, *see United States v. American Trucking Associations*, 310 U.S. at 543, 60 S.Ct. 1059. Because appellant vigorously asserts that both situations are present here, we have turned to the legislative history of exemption 8. *See United Air Lines, Inc. v. McMann*, 434 U.S. 192, 199, 98 S.Ct. 444, 54 L.Ed.2d 444 (1977). In our view, that history supports the Comptroller's position that exemption 8 is clearly applicable to the documents under review.

■ It is true, as appellant urges, that the primary reason for adoption of exemption 8 was to ensure the security of financial institutions.[10] Specifically, there was concern that disclosure of examination, operation, and condition reports containing frank evaluations of the investigated banks might undermine public confidence and cause unwarranted runs on banks.[11] However, there is nothing in the legislative history to indicate that Congress, in seeking to guard against these possibilities, intended exemption 8 to apply only to the varieties of bank examinations then extant, for, in our view, the disclosure of bank examination reports of any type, including those under scrutiny here, could lead to the same

adverse results.[12] Furthermore, a secondary purpose in enacting exemption 8 appears to have been to safeguard the relationship between the banks and their supervising agencies. If details of the bank examinations were made freely available to the public and to banking competitors, there was concern that banks would cooperate less than fully with federal authorities.[13] That secondary purpose would certainly be implicated by appellant's interpretation of exemption 8.

■ Appellant strongly urges, however, that the subsequent passage of the Truth in Lending Act narrows the broad language of exemption 8 insofar as consumer credit matters are concerned. We cannot agree. Appellant has been unable to bring to our attention any statutory language or legislative history of the Truth in Lending Act relating to disclosure of information by government agencies under the FOIA. Furthermore, congressional action subsequent to passage of the Truth in Lending Act sharply undercuts appellant's argument. In 1974, Congress enacted amendments designed to remedy deficiencies that had been illustrated since the FOIA's passage eight years before.[14] Significantly, there was no alteration of exemption 8. Even more damaging to appellant's position, and especially supportive of the view we take, is the fact that the House Committee on Government Operations, which has oversight authority for the FOIA, recently

---

10. The Senate and House reports are in striking accord. The Senate report states:

Exemption No. 8 is directed specifically to insuring the security of our financial institutions by making available only to the Government agencies responsible for the regulation or supervision of such institutions the examination, operating, or condition reports prepared by[,] on behalf of, or for the use of such agencies.

S.Rep.No.813, 89th Cong., 1st Sess. 10 (1965). Similarly, the House Report explains that exemption 8:

is designed to insure the security and integrity of financial institutions, for the sensitive details collected by Government agencies which regulate these institutions could, if indiscriminately disclosed, cause great harm.

H.R.Rep.No.1497, 89th Cong., 2d Sess. 11 (1966), U.S.Code Cong. & Admin.News 1966, pp. 2418, 2428.

11. *See Hearings on S.1663 Before the Subcomm. on Administrative Practice and Procedure of the Senate Comm. on the Judiciary*, 88th Cong., 2d Sess. 186 (1964).

12. Indeed, there is some indication in the legislative history that Congress considered information concerning loans to be one of the more sensitive topics in an examination report. *See id.* at 196–97.

13. *See id.* at 177E, 179, 186, 191, 549; *see also* 44 U.S.C. § 3507 (1970).

14. Act of November 21, 1974, Pub.L.No. 93–502, 88 Stat. 1561.

considered the question whether records reflecting banks' compliance with the Truth in Lending Act should be made available to the public. The Committee concluded that the question needed to be "studied further," [15] a conclusion that would have been unnecessary and incongruous had these records already been subject to disclosure under the FOIA.[16]

## III

We hold that the documents in issue here are expressly exempted from disclosure by exemption 8. Appellant and amici curiae [17] maintain that this result runs counter to the spirit of the FOIA and to the need for full implementation of credit practices fair to consumers.[18] Indeed, there have been suggestions that exemption 8 is both overbroad and superfluous.[19] However, in our view Congress has left no room for a narrower interpretation of exemption 8, and, as so aptly stated by the district judge, "[i]f this is an unfortunate result, recourse is to the Congress rather than the Courts." [20]

*Affirmed.*

J. SKELLY WRIGHT, Chief Judge, concurring:

While I agree with the majority's conclusion that the documents sought by appellant fall within the express terms of Exemption 8 of the Freedom of Information Act, 5 U.S.C. § 552(b)(8) (1976), I feel constrained to write separately both to express my disagreement with any suggestion in the court's opinion that this result flows necessarily from the logic and intent of the Congress that crafted Exemption 8 and to highlight the need for congressional action to resolve the troubling policy issues implicated by the present controversy. The majority, it seems to me, casts as inevitable and obviously correct a result which is in fact questionable.

## I

In May of 1976 appellant, Consumers Union of the United States, Inc., became aware that the Comptroller of the Currency, appellee, had conducted a survey of national banks in the New England Region which revealed substantial noncompliance with regulations promulgated under that portion of the Consumer Credit Protection Act, 15 U.S.C. §§ 1601–1691f (1976), known as the Truth in Lending Act, 15 U.S.C. §§ 1601–1667e (1976).[1] On being informed that the Comptroller intended to keep the survey confidential, appellant made a formal Freedom of Information Act (FOIA) request for

(1) documents submitted to the Comptroller's office by national banks which concern the extent of their compliance with the Truth-In-Lending Act, and (2) any analysis or summary by the Office of

---

**15.** H.R.Rep.No.280, 95th Cong., 1st Sess. 25 (1977) ("Because truth-in-lending compliance examinations are conducted at irregular intervals and do not cover all the kinds of creditors subject to the Act . . . disclosure of overall compliance by individual creditors . . . should be studied further.")..

**16.** At oral argument, Chief Judge Wright asked counsel for the Comptroller whether the interpretation of exemption 8 that counsel was espousing would, in effect, exclude federal bank supervisory agencies from the FOIA. Counsel replied that some matters, such as bank charter applications, are obtainable.

**17.** Consumer Federation of America; Mexican American Legal Defense and Education Fund; and National Organization for Women.

**18.** *See* Brief of Appellant at 9; Brief of Amici Curiae at 6.

**19.** *See* J. O'Reilly, Federal Information Disclosure § 18.01 (1977); Davis, *The Information Act: A Preliminary Analysis*, 34 U.Chi.L.R. 761, 800–01, 807 (1967); Note, *Freedom of Information: The Statute and the Regulations*, 56 Geo.L.J. 18, 50 (1967).

**20.** J.A. at 73a.

**1.** Affidavit of Peter H. Schuck, Director of the Washington Office of Consumers Union of the United States, Inc., July 27, 1977, Joint Appendix (JA) 60a; Affidavit of Thomas W. Taylor, Associate Deputy Comptroller for Consumer Affairs, January 31, 1977, JA 20a, 21a–23a. The Truth in Lending regulations appear at 12 C.F.R. §§ 226.1–226.15 (1977).

the Comptroller of those documents. * * * [2]

The Comptroller denied the request on the authority of regulations incorporating Exemptions 5 and 8 of the FOIA, 5 U.S.C. §§ 552(b)(5) and 552(b)(8) (1976).[3] Shortly thereafter the Comptroller denied appellant's administrative appeal, citing the aforementioned two FOIA exemptions and also regulations derived from Exemptions 4, 6, and 7, 5 U.S.C. §§ 552(b)(4), 552(b)(6), and 552(b)(7) (1976).[4] On August 17, 1976 appellant filed suit in the District Court seeking declaratory and injunctive relief. Judge Pratt granted the Comptroller's motion for summary judgment on November 1, 1977 and dismissed the complaint. JA 72a–73a. He found that the documents at issue fell within the express terms of Exemption 8 of the FOIA, which shields from mandatory disclosure matters "contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions[.]" 5 U.S.C. § 552(b)(8) (1976). *Id.*

2. Taylor affidavit, *supra* note 1, at JA 23a. A copy of the request appears at Record Entry 10, Exhibit 1. The Consumers Union request was subsequently modified to make clear that it did not encompass the names of bank customers or the details of the financial transactions covered. Taylor affidavit at JA 24a. The general results of the survey and the steps taken to achieve compliance by the subject banks have already been made public, exclusive of the names of those banks and particulars of the relevant transactions. *See* Hearings on Federal Banking Agency Enforcement of Truth in Lending Act Before a Subcommittee of the House Committee on Government Operations, 94th Cong., 2d Sess. 82–93 (1976). Relevant portions of the Comptroller's office presentation in those hearings are set forth in an addendum to appellee's brief, pp. 9c–20c.

3. Record Entry 10, Exhibit 2. *See* 12 C.F.R. §§ 4.16(b)(5) and 4.16(b)(8) (1977).

4. Record Entry 10, Exhibit 5. *See* 12 C.F.R. §§ 4.16(b)(4), 4.16(b)(6), and 4.16(b)(7) (1977).

5. Appellee's motion for summary judgment in the District Court and the briefs both in that court and here have focused on the Exemption 8 issue. As the majority points out, there is no need, in light of our disposition of the case, for us to consider the other exemptions raised by the Comptroller.

This appeal followed. It requires us to determine the scope of Exemption 8.[5]

II

The FOIA was enacted in 1966 to overhaul the disclosure provision of the Administrative Procedure Act, 5 U.S.C. § 1002 (1964 ed.). It replaced the vague and discretionary directives of its predecessor with a general mandate for disclosure, procedures for requesting and securing information, a judicial remedy for violations, and a catalog of relatively specific exempted matters. *See generally Dep't of the Air Force v. Rose*, 425 U.S. 352, 360–362, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976); *Environmental Protection Agency v. Mink*, 410 U.S. 73, 79–80, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973); 5 U.S.C. § 552 (1976); S.Rep.No.813, 89th Cong., 1st Sess. 2–10 (1965); H.R.Rep.No.1497, 89th Cong., 2d Sess. 1–12 (1966).[6] Exemption 8 was inserted in the course of hearings and deliberations before the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary.[7] It states:

6. This court has held that the Act places the burden of proving that matters fall within an FOIA exemption on the agency, and that exemptions are to be narrowly construed. *Washington Research Project, Inc. v. Dep't of Health, Educ. & Welfare*, 164 U.S.App.D.C. 169, 175, 504 F.2d 238, 244 (1974), *cert. denied*, 421 U.S. 963, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975).

7. The exemption was originally added to S.1666 —a bill introduced in the 88th Congress by Senator Long of Missouri on June 4, 1963 (109 Cong. Rec. 9946). The Senate Committee on the Judiciary reported the bill out on July 22, 1964—while its Subcommittee on Administrative Practice and Procedure was still holding the hearings discussed at 191 U.S.App.D.C., at ——, 589 F.2d at 539, *infra*. The committee report states that Exemption 8 "is directed specifically to insuring the security of our financial institutions." S. Rep. No. 1219, 88th Cong., 2d Sess. 7 (1964). S. 1666 passed the Senate on July 28, 1964 (110 Cong. Rec. 17089), but there was not enough time remaining for consideration by the House. Its provisions were carried over into S.1160, which, after some further amendments, became the FOIA.

(b) This section does not apply to matters that are—

* * * * * *

(8) contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions[.]

5 U.S.C. § 552(b)(8) (1976).

Both the House and Senate reports on the provision indicate that Congress was concerned that release of bank examination and operating reports could endanger the fiscal well-being of the subject banks. Thus the Senate report states:

Exemption No. 8 is directed specifically to insuring the security of our financial institutions by making available only to the Government agencies responsible for the regulation or supervision of such institutions the examination, operating, or condition reports prepared by[,] on behalf of, or for the use of such agencies.

S.Rep.No.813, 89th Cong., 1st Sess. 10 (1965). And the House report observes:

This exemption is designed to insure the security and integrity of financial institutions, for sensitive details collected by Government agencies which regulate these institutions could, if indiscriminately disclosed, cause great harm.

H.R.Rep.No.1497, 89th Cong., 2d Sess. 11 (1966). Further, testimony presented to the subcommittee which held hearings on the exemption also stressed the dangers of harm to financial institutions,[8] in addition to suggesting other grounds for nondisclosure.[9]

Appellant relies heavily upon the legislative history sketched above and urges that the Truth in Lending Act report and documents it has requested—although termed examination reports by the Comptroller's office [10]—should not be held to fall within Exemption 8 because their disclosure would not lead to the harms that Congress sought to avoid when it adopted the FOIA and that exemption. At that time, Consumers Union points out, there was no Truth in Lending Act.[11] Nor was the Comptroller charged with enforcement of any analogous consumer-oriented legislation. Rather, bank examinations were "primarily designed to determine the soundness of the banks." Reply brief for appellant at 8. Since then, appellant argues, there has been "a significant change of circumstance": Congress has

---

**8.** *See* Hearings on S. 1663 Before the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary, 88th Cong., 2d Sess. 186 (1964) (hereinafter 1964 Senate Hearings); 191 U.S.App.D.C., at ——, 589 F.2d at 540, *infra.*

**9.** *See* 1964 Senate Hearings, *supra* note 8, at 177e, 186, 549; 191 U.S.App.D.C., at —— – ——, 589 F.2d at 539–540 *infra.*

**10.** The documents in suit were generated by a pilot survey of banks in New England instituted by the Comptroller's First Regional Office in late 1974. Affidavit of William Resnik, Consumer Examination Coordinator for the Office of the Comptroller, January 31, 1977, JA 4a, 4a–5a. The program was to include

significantly greater in-depth examination of bank records, such as advertising materials, mailings to bank customers, and loan files, and questioning of bank officers in connection with policies, procedures, and forms pertaining to consumer loans, than occurred in the course of the normal commercial bank examinations. * * *

*Id.* at 5a. Initially, Mr. Resnik conducted the intensified consumer examinations in person,

while the regular commercial examination was also going on. *Id.* Subsequently, he drafted a questionnaire which "consisted of the same questions which I had asked of bank personnel during the course of my in-bank examinations [and which] requested * * * copies of exactly the same types of records and documents which I would have examined in the files of the bank during the course of an in-bank examination." *Id.* at 5a–6a. These questionnaires were sent to 27 selected banks, brief for appellee at 8, out of the 186 national banks in the six-state New England Region, *id.* at 17.

In its submissions to this court and the District Court the Comptroller's office has been at pains to point out that the letters to the banks, the documents and answers submitted by them, and the reports and notations prepared by bank examiners on and concerning those documents are similar to typical letters, documents, and reports prepared in the course of any other bank examination. *See, e. g.,* Taylor affidavit, *supra* note 1, at JA 20a–22a.

**11.** The Truth in Lending Act, 15 U.S.C. § 1601 *et seq.,* was enacted in 1968, 82 Stat. 146.

adopted a host of consumer protection statutes and delegated to the Comptroller the responsibility of ensuring compliance by national banks.[12] Thus, appellant asserts, we must look beyond the plain words of the exemption and interpret the phrase "examination, operating, or condition reports" by exploring the available indicia of congressional intent and the circumstances that obtained when Congress chose those words. When this is done, appellant concludes, it becomes clear that Exemption 8 applies only to those matters the disclosure of which might cause the public to lose confidence in the soundness of particular financial institutions and therefore cause a "run" on those institutions.

While I think the present case is not free from doubt, I concur with the court that appellant must fail in its effort to recast Exemption 8 from a provision that looks to the nature and source of material into one that focuses on the likely consequences of disclosure. It is of course true that a court is free to look beyond the plain meaning of the words used by Congress where to give effect to that meaning would lead to absurd results, or even to a result that is "merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' * * *," *United States v. American Trucking Ass'ns, Inc.,* 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed.2d 1345 (1940), *quoting Ozawa v. United States,* 260 U.S. 178, 194, 43 S.Ct. 65, 67 L.Ed. 199 (1922). *See also Perry v. Commerce Loan Co.,* 383 U.S. 392, 397–400, 86 S.Ct. 852, 15 L.Ed.2d 827 (1966). And a significant change of circumstances coming after Congress chose the statutory language could in many cases be a good reason to focus on the legislative intent rather than on words which have become an anachronism. But here the change in circumstances was effected *by Congress.* It chose in 1968 and succeeding years to expand the Comptroller's responsibilities and thus, in effect, to expand the range of issues and information into which examiners employed by the Comptroller would be likely to inquire. If, as appellant asserts, Exemption 8 has become an anachronism as applied here, it is Congress that so rendered it. And neither in the process of expanding the Comptroller's role nor in subsequent amendments to the FOIA [13] did Congress choose to alter its characterization of the documents relating to financial institutions that are excepted from the FOIA by Exemption 8.[14]

---

12. Appellant directs our attention to eight consumer-oriented statutes in addition to the Truth in Lending Act that have been enacted since 1968. They are: the Fair Housing Act, 42 U.S.C. § 3605, 82 Stat. 83 (1968) (and amended 88 Stat. 729 (1974)); the Fair Credit Reporting Act, 15 U.S.C. § 1681, 84 Stat. 1128 (1970); the Real Estate Settlement Procedure Act, 12 U.S.C. § 2601, 88 Stat. 1724 (1974) (and amended 89 Stat. 1157 (1976)); the Fair Credit Billing Act, 15 U.S.C. § 1666, 88 Stat. 1512 (1974); the Equal Credit Opportunity Act, 15 U.S.C. § 1691, 88 Stat. 1521 (1974) (and amended 90 Stat. 251 (1976)); the Home Mortgage Disclosure Act, 12 U.S.C. § 2801, 89 Stat. 1125 (1975); the Consumer Leasing Act of 1976, 15 U.S.C. § 1667, 90 Stat. 257 (1976); and the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, 91 Stat. 874 (1977). The Comptroller is empowered to enforce the Truth in Lending Act against national banks by 15 U.S.C. § 1607 (1976).

13. Congress remedied a number of deficiencies in the FOIA in 1974. *See* Act of November 21, 1974, Pub.L. 93–502, 88 Stat. 1561. Exemption 8 was not changed.

14. In September 1976 a subcommittee of the House Committee on Government Operations held hearings on enforcement of the Truth in Lending Act by federal banking agencies. In a report issued thereafter the full committee discussed the pros and cons of disclosure of violations. H.R.Rep.No.95–280, Third Report by the House Government Operations Committee on the Truth in Lending Act: Federal Banking Agency Enforcement and the Need for Statutory Reform, 95th Cong., 1st Sess. (May 10, 1977). The Committee—which must have assumed, as we today hold, that specific information about violations was not obtainable under the FOIA—considered two facets of the disclosure question. First was whether "the overall degree of truth-in-lending compliance by individual creditors should be disclosed to the public." *Id.* at 25. On this point the Committee concluded that further study would be needed on grounds that:

> Though consumer knowledge of creditor compliance histories would be useful in comparative credit shopping, such information would not be available on a uniform basis for all creditors. For example, commercial bank compliance is evaluated on a direct examination basis, whereas, finance company compli-

I recognize that it can be treacherous to build too ambitiously upon a foundation of congressional silence or inaction. For it is clearly possible that Congress never noticed the intersection of the Truth in Lending and Freedom of Information acts. But before concluding that this is what occurred, and before substituting our own words for those of Congress if we do so conclude, we would do well to be *certain* that our words are truer to the legislative intent than are the words chosen by the legislators whose intent we explore. In my judgment, the requisite certainty is lacking. Yet I also find myself in disagreement with the court's assertion that "[i]n our view, [the legislative] history supports the Comptroller's position that Exemption 8 is clearly applicable to the documents under review." Majority opinion, 191 U.S.App.D.C. at ——, 589 F.2d at 534. It seems to me that the legislative history is inconclusive—neither clear enough in one direction to justify a departure from the words Congress chose in 1966 and kept thereafter, nor clear enough in the other to support the court's endorsement of the Comptroller's position.

In the first place, the history is rather sparse. Little actual discussion of the proper scope of the exemption has been brought to our attention, and what there is is only of tangential relevance.[15] Thus we really have only the segments of committee reports already quoted[16] and some testimony before the Subcommittee on Administrative Practice and Procedure of the Senate Judiciary Committee.[17] Further, what history we have is less than crystal clear. The House and Senate reports make reference to the "integrity" and "security" of financial institutions—words that could, as appellant urges, refer only to commercial soundness and solvency. But those words might have somewhat broader import as well, perhaps encompassing the need for a smoothly functioning regulatory regime, a goal which the Comptroller's office has sought to persuade both us and Congress is best accomplished under a rule of strict confidentiality for examination reports.[18]

A look at the Senate hearings is scarcely more enlightening. As appellant points out, those hearings do include references to solvency and soundness concerns. For ex-

ance is evaluated on the basis of borrower complaints filed with the Federal Trade Commission. The two approaches are in no way comparable. *Id.* Second, the Committee explored the utility of disclosing "specific truth-in-lending violations * * * to affected individual borrowers." *Id.* The Committee concluded that borrowers should be informed of at least substantial violations so they could avail themselves of civil remedies provided in the Act and thereby serve as private attorneys general. *Id.* at 26–27. Notifying borrowers of substantial violations, the Committee observed, would not compromise the confidentiality of the standard safety and soundness examination of commercial banks because Truth in Lending Act violations need not be carried out under the auspices of the regular examination and, where they are so carried out, can be reported separately. Disclosure of such violations, the Committee added, "except in very unusual cases," would not endanger the safety and soundness of a particular institution. *Id.* at 27. The Committee suggested various amendments to effectuate its recommendations. *Id.* at 38–48.

Both sides in the instant case make reference to the Committee's report—appellee for the proposition that the information sought is at present exempt from the FOIA and appellant for its argument that disclosure of that infor-

mation would not impair public confidence in financial institutions. But the opinions and conclusions reached by a congressional committee in 1977 do not tell us what was intended by the Congresses that enacted the FOIA and the Truth in Lending Act. Thus, however valuable it is for determining what the law ought to be, the Committee report cannot answer the question before us today because it does not tell us what the law is now.

**15.** In the course of the 1964 Senate Hearings, *supra* note 8, spokesmen for the Comptroller's office did enter into a discussion with members of the subcommittee concerning the advisability of exempting applications for national bank charters. 1964 Senate Hearings at 179–180, 184–186. That discussion indicates that applications were deliberately not included in Exemption 8.

**16.** *See* 191 U.S.App.D.C., at ——, 589 F.2d at 537, *supra.*

**17.** *See* 191 U.S.App.D.C. at —— ——, 589 F.2d at 539–540 *infra.*

**18.** *See* 1964 Senate Hearings, *supra* note 8, at 186; Taylor affidavit, *supra* note 1, at JA 27a–28a; brief for appellee at 46–47.

ample, in a letter to Senator James O. Eastland, Chairman of the Senate Judiciary Committee, the chairman of the Federal Home Loan Bank Board wrote that "even delicate and sensitive matters relating to the condition or affairs of financial institutions" might come under the Act as it then read "without regard to the fact that, under certain conditions, such disclosure might precipitate runs and pressures on such institutions which could threaten the entire economic structure of the country." Hearings on S. 1666, and S. 1663 (in part) Before the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary, 88th Cong., 1st Sess. 292 (1963). And the following July, in his appearance before the subcommittee, Robert Bloom, chief counsel to the Comptroller, stated that release of "detailed information concerning every aspect of the business of [a] bank * * * to an unsophisticated public could, through misunderstanding, undermine confidence and cause unwarranted runs on banks." Hearings on S. 1663 Before the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary, 88th Cong., 2d Sess. 186 (1964). But the problem of public confidence in fiscal soundness was not the only one brought to the attention of Congress. Mr. Bloom also stressed that disclosure of "examination, operation, and condition" reports would "be grossly unfair and in violation of basic principles of competition," that it would jeopardize the privacy of bank officials, and that it would "make bankers most reluctant to cooperate with our examiners and seriously hamper the Comptroller in the exercise of his assigned duties." *Id.* In addition, a letter to the subcommittee from the American Bankers Association stressed the preliminary and conclusory nature of many of the statements contained in examination reports.[19] *Id.* at 549. It simply is not clear to me that the legislators who drafted Exemption 8 were motivated *only* by a fear of causing runs on banks.

Finding the legislative history somewhat opaque, I return to the words Congress chose. And here, as the court observes, appellant can find little comfort. Certainly the present Exemption 8 seems an odd way of phrasing the kind of provision which appellant claims was intended. For Congress did not exempt only "those matters contained in the files of bank regulatory agencies the release of which might cause unwarranted runs on banks." It excepted "examination and operating reports," and it must have known that not every document "contained in or related to" such reports would include information that might undermine public confidence in the solvency of a financial institution.[20] To be sure, a clear-cut legislative history might be evi-

---

**19.** A similar letter was sent to the House Government Operations Committee by the Federal Deposit Insurance Corporation. Hearings on H.R. 5012 Before a Subcommittee of the House Government Operations Committee, 89th Cong., 1st Sess. 435 (1965).

**20.** The powers and duties of bank examiners are set forth in 12 U.S.C. § 481 (1976) which states:

> The examiner making the examination of any national bank shall have power to make a thorough examination of *all* the affairs of the bank and in doing so he shall have power to administer oaths and to examine any of the officers and agents thereof under oath and shall make a full and detailed report of the condition of said bank to the Comptroller of the Currency[.] * * *

(Emphasis added.) In addition, the examiner is charged with making a full examination of any affiliates of the bank and of the relationship between those affiliates and the bank. *Id.*

Associate Deputy Comptroller Taylor stated in his affidavit that

> an examination of a national bank and resulting working papers and the report of such examination are not limited solely to a consideration of those aspects of the bank's operations which are concerned entirely with safety and solvency. Rather, examiners investigate, and the reports of examination consider, such matters as employee benefit plans, loans which may be entirely satisfactorily [*sic*] from a credit standpoint but which nonetheless violate the lending limitations contained in 12 U.S.C. § 84 [relating to the maximum amount a bank can loan to any one person], and bank investment in bonds or securities which investments, although they may be entirely sound, may also be illegal. * * *

Taylor affidavit, *supra* note 1, at JA 25a–26a. Many such items would be unlikely to cause consumers to lose confidence in the bank's soundness if disclosed.

dence that Congress chose to be deliberately overinclusive in the interests of easy administration and certainty—that it wanted to make a categorical, bright-line rule. If so, for appellant to prevail in the instant case we would have to be convinced that subsequent events have made the exemption so much more overinclusive that it is in need of a judicial refit. I think we lack both the resources and the congressional guidance to undertake such an inquiry. And, if Congress wanted a bright line, I am not persuaded that we are the ones who should smudge it. Indeed, if we were to follow appellant's lead we would shortly face a number of problems relating to which documents unearthed by the Comptroller's office should or should not be deemed likely to cause the kinds of harms with which Congress was concerned. I am not confident that we have adequate criteria to resolve such questions.

### III

In conclusion, I find the legislative history insufficient to persuade me that we should ignore the plain meaning of the words. Rather, I agree with Judge Tamm: the result of applying Exemption 8 as written is not "absurd," "unreasonable," or " 'plainly at variance with the policy of the legislation as a whole' * * *." *United States v. American Trucking Ass'ns, Inc., supra,* 310 U.S. at 543, 60 S.Ct. at 1064. Yet I do not think that our and Congress' result sits entirely comfortably with the broad thrust of the FOIA, or that congressional alterations could not improve enforcement of the Truth in Lending Act. Indeed, the matter is, I believe, in serious need of legislative attention. First, a cen-

tral proposition underlying Exemption 8—that certain information must be kept from the public for fear that it will be misunderstood and lead to overreaction—is somewhat inconsistent with the philosophy behind the FOIA.[21] Second, the mere fact that there is a long-standing tradition of confidentiality for bank records—a tradition occasionally referred to with some reverence in testimony before the Senate subcommittee[22]—strikes me as irrelevant. It may be time for a reexamination. Third, the Comptroller's argument that confidentiality is necessary to maintain the smooth functioning of the examination process and the cooperation of bank officials seems to me to be of very limited force. Not only does the Comptroller have a considerable arsenal of weapons at his disposal to compel disclosure,[23] but the costs of employing that arsenal are assessed upon the institutions he supervises.[24] Recalcitrance on the part of the banks would therefore lead simply to higher assessments. Further, it should go without saying that preserving good relations between regulators and those they regulate is a goal which, however desirable in moderation, can if overemphasized be flatly inconsistent with the very purposes of regulation itself. Fourth, the present practice of not disclosing the identities of banks which violate the Truth in Lending Act (and of not notifying injured borrowers of violations, may be retarding achievement of substantial compliance with that Act.[25]

I join, therefore, with appellant in feeling that further study and some change is necessary. But I join with the majority of this panel and the District Court in suggesting that it seek relief from Congress rather than the courts.

---

21. *See* authorities cited at majority op. note 19.

22. *See* 1964 Senate Hearings, *supra* note 8, at 177e, 179, 191, 549.

23. *See* 12 U.S.C. § 481 (1976) (giving examiners power to examine all documents and to compel testimony, and setting forth sanctions for failure to cooperate).

24. *See* 12 U.S.C. §§ 481–482 (1976).

25. This question was slated for further study by the House Committee on Government Operations in its 1977 report. *See* note 14 *supra.* In the instant case appellant has submitted affidavits suggesting that a policy of disclosure can be an important way of furthering Truth in Lending Act enforcement. *See* Affidavit of John E. Quinn, Superintendent of the Bureau of Consumer Protection for the State of Maine, February 15, 1977, JA 63a; Affidavit of Lawrence Connell, Jr., Bank Commissioner for the State of Connecticut, March 9, 1977, JA 67a.