# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 5, 2014      Decided November 14, 2014

No. 13-5137

PUBLIC INVESTORS ARBITRATION BAR ASSOCIATION,
APPELLANT

v.

SECURITIES AND EXCHANGE COMMISSION,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-02285)

———

*Julie A. Murray* argued the cause for appellant. With her on the briefs was *Daniel A. Ball*.

*Brian Wolfman* was on the brief for *amici curiae* Citizens for Responsibility and Ethics in Washington, et al., in support of appellant.

*Karen J. Shimp*, Special Trial Counsel, U.S. Securities and Exchange Commission, argued the cause for appellee. With her on the brief were *Melinda Hardy*, Assistant General Counsel, and *Sarah E. Hancur*, Senior Counsel. *Kathleen Cody*, Senior Counsel, entered an appearance.

Before: TATEL and BROWN, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Concurring opinion filed by *Circuit Judge* BROWN.

TATEL, *Circuit Judge*: Exemption 8 of the Freedom of Information Act protects from disclosure records "related to examination . . . reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions." Congress has now clarified that the Securities and Exchange Commission is such an agency and—central to the issue before us—that the Financial Industry Regulatory Authority (FINRA), a private organization that oversees securities arbitrations, is such an institution. In this case, the Commission argues that Exemption 8 allows it to withhold documents it collected while examining FINRA's program for arbitrating disputes between securities brokers and their customers. The district court agreed, and, for the reasons set forth in this opinion, so do we.

**I.**

The Exchange Act of 1934 authorizes the Commission to delegate "certain governmental functions to private [self-regulatory organizations]." *In re Series 7 Broker Qualification Exam Scoring Litigation*, 548 F.3d 110, 114 (D.C. Cir. 2008). Pursuant to this sort of delegation, FINRA enforces securities rules with respect to its members—securities brokers and dealers doing business with the public. FINRA also facilitates nearly all securities-related arbitrations and mediations in the United States. In those arbitration proceedings, the parties are presented with a list of arbitrators, may strike available arbitrators under certain conditions, and must rank the remaining ones in order of

preference. FINRA collects those lists and appoints a panel made up of the arbitrators with the best combined rankings.

The Commission has "broad authority" to oversee FINRA's practices "relating to customer disputes, including the power to mandate the adoption of any rules [the agency] deems necessary to ensure that arbitration procedures adequately protect statutory rights." *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 233–34 (1987). That oversight may take the form of such "reasonable periodic, special, or other examinations" as the Commission "deems necessary or appropriate in the public interest." 15 U.S.C. § 78q (also known as Exchange Act § 17). Drawing on this authority, the Commission's Market Oversight Program inspects FINRA's arbitration services and recommends policy changes when appropriate. *See* U.S. Government Accountability Office, GAO–12–625, Securities Regulation: Opportunities Exist to Improve SEC's Oversight of the Financial Industry Regulatory Authority 10–11, 18–19 (2012).

Appellant, the Public Investors Arbitration Bar Association (PIABA), is an organization whose members represent individual investors in disputes with securities brokers. As part of its mission, PIABA promotes the arbitration-related interests of its constituents. In pursuit of that goal, PIABA sent the Commission a FOIA request seeking records related to the agency's audits, inspections, and reviews of FINRA's arbitration program.

Acting on that request, the Commission searched its archives and identified 65 boxes containing potentially responsive records, most of which concern the agency's responses to consumer complaints about FINRA's arbitration process. But it refused to turn those documents over to PIABA, claiming that the requested records were all protected from disclosure under Exemption 8. That provision allows the

Commission to withhold records that are "contained in or related to [its] examination . . . reports." 5 U.S.C. § 552(b)(8). Concluding that it collected all responsive documents while examining FINRA's arbitration program—including during several inquiries it initiated in response to consumer complaints—the Commission denied PIABA's FOIA request and its subsequent administrative appeal.

With these administrative proceedings behind it, PIABA sued the Commission in the United States District Court for the District of Columbia, and the parties cross-moved for summary judgment. The district court granted the Commission's motion, concluding that the requested records "relate[] to" the agency's "examinations" of FINRA and that Exemption 8 therefore protects them from disclosure. *Public Investors Arbitration Bar Association v. SEC*, 930 F. Supp. 2d 55 (D.D.C. 2013). In arriving at this conclusion, the district court rejected PIABA's two main contentions: that Exemption 8 protects only information related to *financial* examinations and so does not apply to the Commission's oversight of FINRA's arbitration program; and that the agency failed to identify a particular report to which each contested document relates. Addressing the first argument, the district court relied on what it called Exemption 8's "plain meaning" and purpose, as well as its relationship to other financial legislation. It emphasized that Exemption 8 nowhere distinguishes between a regulated entity's financial and administrative activities, and it found that applying Exemption 8 in this case would serve the enacting Congress's stated purpose of protecting the cooperative relationship between the Commission and the entities it regulates, including FINRA. *Id.* at 63–67. As for PIABA's second argument—that not every "potentially responsive document . . . relate[s] to [a particular] examination report of some kind"—the district court held that nothing in Exemption 8 requires the Commission to point to any

such specific report. In any event, the district court found, the Commission had in fact met that burden, pointing out that the agency had conducted its inquiries into PIABA's arbitration program under its examination authority and that each investigation "resulted in a writing, either termed a report or closing memorandum." *Id.* at 70–72.

PIABA now appeals. "We review the district court's disposition on summary judgment de novo. In the FOIA context this requires that we ascertain whether the agency has sustained its burden of demonstrating that the documents requested are . . . exempt from disclosure under [] FOIA." *ACLU v. DOJ*, 655 F.3d 1, 5 (D.C. Cir. 2011) (citations and internal quotation marks omitted). "[B]ecause FOIA's terms apply government-wide," moreover, "we generally decline to accord deference to agency interpretations of the statute, as we would otherwise do under *Chevron*." *Al-Fayed v. CIA*, 254 F.3d 300, 307 (D.C. Cir. 2001).

## II.

Read beginning to end, FOIA Exemption 8 protects information "contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions." 5 U.S.C. § 552(b)(8). Although the exemption is a mouthful, Congress has gone to some trouble to spell things out. It has made clear, for example, that "[f]or the purpose of FOIA, the Commission is an agency responsible for the regulation or supervision of financial institutions," and it has confirmed that "any entity . . . the Commission is responsible for regulating, supervising, or examining under [the Exchange Act] is a financial institution." 15 U.S.C. § 78x(e). Here, the Commission does not argue that the requested records pertain to operating or condition reports. To resolve this case, then, we

need determine only whether the requested records are "contained in or related to" an "examination report" that Exemption 8 covers. That inquiry proceeds in two parts: we first address whether the contested records implicate a relevant Commission "examination" and, if they do, we then ask whether they relate to a particular "report."

Examination

Although insisting that Exemption 8 provides no protection for the records it seeks, PIABA has strikingly little evidence for that claim. The organization begins with a cursory nod to the exemption's text, arguing that "examination report" is "not part of common parlance" but rather is an "industry-specific" term with a "special or technical meaning." Appellant's Br. at 22–24. Accordingly, it urges us to read the phrase as a "term of art," rather than as a general definition that applies to all agencies in all situations. *Id.* Such precise, industry-specific meaning, PIABA admits, does not emanate from the text of the statute— or, indeed, from anything else in the U.S. Code.

To tease out the words' specific meaning, PIABA goes directly to Exemption 8's legislative history, which it claims reveals that Congress intended to protect only financial information and not "reviews or inspections of a purely administrative function of a[] self-regulatory organization like FINRA." *Id.* at 24. Guided by that narrow meaning, PIABA emphasizes that the records at issue here have no bearing on FINRA's financial transactions or its fiscal condition. Instead, they "concern FINRA's management of its arbitrator pool, its selection and evaluation of those arbitrators, and the adequacy of arbitrators' disclosures." *Id.* at 32. The requested documents, PIABA concludes, therefore do not qualify as the type of examination reports Congress wrote Exemption 8 to protect.

By contrast, the Commission largely sticks to the text of Exemption 8 and related statutes. The word "examination," the Commission tells us, is not at all "obscure." Appellee's Br. at 12. Instead, the term has a plain meaning unencumbered by context. Indeed, the Commission argues, neither Exemption 8 nor the agency's enabling legislation or regulations limit the meaning of "examination" to the purely financial. *Id.* (citing 15 U.S.C. § 78q(b); 17 C.F.R. § 240.17a-1).

To resolve this debate, we begin, as always, with the statute's text—and, in particular, with the word "examination." *See Consumers Union of United States, Inc. v. Heimann*, 589 F.2d 531, 533 (D.C. Cir. 1978) (in FOIA cases, "a reviewing court must accord first priority in statutory interpretation to the plain meaning of the provision in question"). Mindful of that canon of construction, this court has explained time and again that Exemption 8's scope is "particularly broad." *Id*. Rejecting the claim that Exemption 8 protects only documents whose disclosure would harm bank depositors, for example, we observed that the exemption's "broad, all-inclusive scope" allows us to apply the statute "as written"—that is, without adding any extra requirements—"since Congress ha[s] 'intentionally and unambiguously' so contemplated." *Gregory v. FDIC*, 631 F.2d 896, 898 (D.C. Cir. 1980) (per curiam) (quoting *Consumers Union*, 589 F.2d at 533). We reached this conclusion despite the general rule requiring that we interpret FOIA's exemptions narrowly. *See Vaughn v. Rosen*, 484 F.2d 820, 823 (D.C. Cir. 1973). After all, "it is not [this Court's] function, even in the FOIA context, to subvert" the plain meaning of the statute. *Consumers Union*, 589 F.2d at 533.

In this case, the statute's plain meaning is all but conclusive. Guided by the dictionary, we think it quite clear that "examination" reports encompass any report stemming from the

Commission "inspect[ing] closely" or "inquir[ing] carefully" into something. WEBSTER'S NEW COLLEGIATE DICTIONARY 397 (Henry Bosley Woolf, ed., 1977).

That "something," moreover, is limited by the rest of Exemption 8's text. Although the language could be sharper, the statute's context and subsequent amendments make clear that it protects from disclosure only materials that are "contained in or related to examination . . . reports" that are both (1) prepared by an "agency responsible for the regulation . . . of financial institutions" and (2) compiled in the course of that agency's regulation of a financial institution. To be sure, a wooden reading of Exemption 8's text might lead the reader to believe that its scope depends only on whether the agency doing the examination is an agency "responsible for the regulation . . . of financial institutions," not on whether the organization that was the subject of the examination itself qualifies as a "financial institution." That reading, however, is out of line with the original purpose of the statute, as well as the views of every relevant legislator and industry player.

Congress enacted Exemption 8 to address the "concern[] that release of bank examination and operating reports could endanger the fiscal well-being of [] subject banks." *Consumers Union*, 589 F.2d at 537. Reading the statute's reference to "financial institutions" to limit only the agency whose records are exempt would depart from the statute's original purpose. After all, such an interpretation would mean that an agency that regulates financial institutions—say, the Securities and Exchange Commission—could withhold any examination report it prepares, even if the report detailed the operations of an institution that is not even vaguely financial. This can hardly be what Congress intended when it sought to protect the "well-being of . . . banks."

Even the Commission's own chair does not read the statute's protections so broadly. Testifying in front of the House Financial Services Committee in 2010, she observed that "[t]hough . . . Exemption 8[] does provide important protections from disclosure for examination materials *obtained from* 'financial institutions,' that term is not defined in the law," and it "might not clearly cover [certain] materials and protect them from disclosure" because "courts have not yet addressed whether certain entities the Commission has the authority and the responsibility to examine . . . are financial institutions for purposes of these FOIA protections." *Legislative Proposals to Address Concerns over the SEC's New Confidentiality Provision, Hearing Before the House Committee on Financial Services*, 2d Session, 111th Congress 10, 12 (2010) (emphasis added).

Perhaps with that potential confusion in mind, Congress stepped in to clear things up in 2010 and, in the process, confirmed the chair's—and our—reading of Exemption 8. Responding to concerns that a separate Dodd-Frank provision muddied the Exemption 8 waters, Congress passed two amendments to the Exchange Act—and, by reference, to FOIA—that made apparent once and for all the exemption's striking breadth, at least with respect to the Securities and Exchange Commission. First, Congress confirmed that "[f]or the purposes of [FOIA], the Commission is an agency responsible for the regulation or supervision of financial institutions." 15 U.S.C. § 78x(e)(1). And second, perhaps fearing that a future court might find that examinations of non-financial entities are not covered by Exemption 8—if, for example, that court credited the Commission chair's reading of the statute—Congress went a step further, clarifying that "[f]or the purposes of [FOIA] . . . any entity for which the Commission is responsible for regulating

[*sic*], supervising, or examining under [the Exchange Act] is a financial institution." 15 U.S.C. § 78x(e)(2).

Read in a vacuum, the latter provision would make Exemption 8 entirely circular. Taking both amendments into account, the text would read: "[FOIA] does not apply to matters that are . . . contained in or related to examination . . . reports prepared by, on behalf of, or for the use of [the Commission, which is] an agency responsible for the regulation or supervision of [entities the Commission is responsible for regulating or supervising]." But we think this interpretation would render Exemption 8 absurd; indeed, we can think of no "plausible reason why Congress might have intended [this] result[]." *Landstar Express America, Inc. v. Federal Maritime Commission*, 569 F.3d 493, 498 (D.C. Cir. 2009) (internal quotation marks omitted). Mindful that we are to avoid absurdities, we conclude that in passing the second half of the 2010 fix, Congress purposefully reaffirmed the chair's reading of Exemption 8's application to the Commission. By clarifying that "financial institution" means "any entity the Commission regulates," Congress conditioned the exemption's reach on whether the institution being examined is a "financial institution"—though, still, not on whether the particular *records* would divulge financial data. This means that, in essence, one should read "examination, operating, or condition reports" to mean "examination, operating, or condition reports *related to financial institutions*." After all, with the first half of the amendment, Congress clarified that the Commission is an agency responsible for the regulation of financial institutions. Why would it have added a subsection to specify which organizations are financial institutions if nothing depended on it?

An example should be helpful. To repurpose slightly a hypothetical one of us used at oral argument, suppose Congress gives the Commission jurisdiction over the National Football League and suppose further that the agency chooses to use its resources to examine the League's response to the rising tide of player concussions. Even with these new responsibilities, by the plain language of FOIA and the newly amended Exchange Act, the Commission would still be an "agency responsible for the regulation or supervision of financial institutions," and the NFL would have become a "financial institution" for Exemption 8 purposes simply because the Commission regulates it. Accordingly, any resulting Commission report on football concussions would qualify as an "examination . . . report prepared by an agency responsible for the regulation or supervision of financial institutions" and, crucially, as an examination report *related to a financial institution.* To put it another way, although no one would argue that the NFL is a financial institution in the traditional sense—billion-dollar television deals notwithstanding—and although a report on the League's concussion protocol is unlikely to expose financial information, the Commission is indisputably an agency responsible for regulating financial institutions, and, by the terms of the 2010 amendment, the NFL would qualify as a financial institution. As a result of those amendments, then, any report arising out of the Commission's examination of the NFL would be exempt from disclosure whether or not it risks outing someone's financial details.

In sum, then, we hold that documents the Commission collects while examining financial institutions—that is, while examining any organization the agency regulates—are exempt from disclosure. This is true no matter the records' substance so long as they relate to a resulting report. The Commission

satisfies the "examination" requirement here. Whether it also checks the "report" box is the subject of the next section.

Before we address that issue, however, we think it important to emphasize that our broad reading of Exemption 8 extends no further than the walls of the Securities and Exchange Commission. Because the 2010 amendments defined "financial institution" broadly only with respect to the Commission, this opinion has nothing to say about the ability of other financial agencies—say, the Consumer Financial Protection Bureau—to withhold specific records.

## Report

Exemption 8 allows the Commission to withhold records that relate to an examination "report." The district court announced two conclusions on this issue. First, it held that "Exemption 8 does not require the defendant to identify a specific report to which the information relates." *Public Investors Arbitration Bar Association*, 930 F. Supp. 2d at 72 (quoting *Judicial Watch, Inc. v. Department of Treasury*, 796 F. Supp. 2d 13, 37 (D.D.C. 2011)). Second, it found that, as a factual matter, "each potentially responsive document [in this case] does appear to relate to an examination report of some kind." *Id.* at 71. We have little to go on in answering the doctrinal question of whether each withheld document must relate to a specific examination report, though district courts in this circuit have held that it need not. *See Judicial Watch, Inc. v. Department of Treasury*, 796 F. Supp. 2d 13, 37 (D.D.C. 2011); *McKinley v. FDIC*, 744 F. Supp. 2d 128, 144 (D.D.C. 2010). Fortunately, we can resolve this case without addressing that issue, as the Commission has pointed to particular examinations—culminating in written products—to which the contested documents relate.

PIABA's argument to the contrary rests entirely on the Commission's statement, contained in the sworn testimony of a senior staffer, that "each potentially responsive document relates to one of . . . four examinations . . . *and/or* relates to one or more customer complaints." Appellant's Br. at 44; Declaration of Kristen Lever, JA 30, ¶ 14 (emphasis added). According to PIABA, the "and/or" means that the Commission left open the possibility that any one of the individual documents may relate *only* to a report arising out of a customer complaint and *not* to a report stemming from an examination. Therefore, PIABA concludes, the declaration fails to assert that each withheld document relates to an examination, much less to an examination report. We disagree for two reasons.

To begin with, the declarant did not stop with her "and/or" statement. Instead, she explained that all "documents potentially responsive to PIABA's FOIA request relate to four examinations conducted by [the Commission]" and that "some of the potentially responsive documents may relate to particular complaints received by the SEC from arbitration participants." Lever Decl., JA 27, ¶ 7, 8. In other words, she clarified that all of the relevant documents relate to a Commission examination, and some of those documents may *also* implicate customer complaints.

But even if we were to credit the "and/or" statement over these contrary assertions, we would reject PIABA's argument because, as we have explained, an "examination report" is any report arising out of a "close inspection" or "careful inquiry." WEBSTER'S NEW COLLEGIATE DICTIONARY 397 (Henry Bosley Woolf, ed., 1977). PIABA offers no reason to think the Commission was not conducting such an inspection or inquiry when responding to customer complaints. That the affidavit appears to separate examinations from responses to consumer

complaints hardly means that such responses are not also examinations. So even if a particular withheld document relates *only* to an inspection of a customer complaint, Exemption 8 applies with full force.

## III.

For the foregoing reasons, the Commission satisfied both of Exemption 8's requirements and thus properly withheld all responsive documents. We affirm.

*So ordered.*

BROWN, *Circuit Judge*, concurring:

We began in 1978 by interpreting Exemption 8's categorically narrow exclusion broadly. Today, we dispense with that category. A plain reading of the text and our precedents seem to compel the Court's conclusion. Yet the result is a disquieting one. As the district court observed—the 2010 amendment "was a well-intentioned legislative fix which . . . resulted in its own . . . unintended consequences," by "giv[ing] back with [] FOIA what [Congress] simultaneously intended to take away by repealing section 929I." *Public Investors Arbitration Bar Association v. SEC*, 930 F. Supp. 2d 55, 69–70 (D.D.C. 2013). Exemption 8 is no longer merely a necessary hedge against the disclosure of critical financial records. Instead, like the mythical Ouroborus, the amendment may now swallow Congress's purported commitment to let "citizens know what their government is up to." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171–72 (2004).

\* \* \*

Our Exemption 8 cases are variations on a single theme: the exemption is "particularly broad" in scope, reflecting Congress's "intentional[] and unambiguous[]" intent to craft an "all-inclusive" definition. *Consumers Union of U.S., Inc. v. Heimann*, 589 F.2d 531, 533 (D.C. Cir. 1978). Without looking to the legislative history to interpret plain statutory text, *Totten v. Bombardier Corp.*, 380 F.3d 488, 494 (D.C. Cir. 2004), we may recognize that the universe of financial regulation has been radically transformed since Congress originally drafted Exemption 8's broad language and since this Court first gave it effect. Initially, Exemption 8 was cabined by its context. Congress did not reference "examination" reports in a vacuum; the word is employed as part of an allied series protecting records contained in or related to "examination, operating, or condition reports."

5 U.S.C. § 552(b)(8). Such phrasing was intentional. *See Platt v. Union Pac. R.R. Co.*, 99 U.S. 48, 59 (1878) ("[N]o words are to be treated as surplusage or as repetition.") (citing state law canons of statutory construction). Congress was drafting under the principal assumption that it was regulating a world largely consisting of banks and like financial institutions, and Congress was primarily addressing the palpable "concern[] that release of bank examination and operating reports could endanger the fiscal well-being of [] subject banks." *Consumers Union*, 589 F.2d at 537. Disregarding its modestly questionable syntax, the original text of Exemption 8 makes clear that Congress's limitation "of financial institutions" modifies both the "agency responsible for the regulation" and materials "contained in or related to examination, operating, or condition reports." 5 U.S.C. § 552(b)(8). *Cf.* NORMAN J. SINGER & SHAMBIE SINGER, STATUTES AND STATUTORY CONSTRUCTION § 47:33 (7th ed. 2014) ("[W]here the sense of an entire act requires that a qualifying word or phrase apply to several preceding . . . sections, the qualifying word or phrase is not restricted to its immediate antecedent."). And this emphasis on protecting fundamentally financially-related materials serves as the central tenet rationalizing Exemption 8's existence.

Admittedly, our case law has derived a secondary purpose behind Exemption 8's promulgation, not moored directly to the statutory text but of some undeniable, though not equal, import: "safeguard[ing] the relationship between the banks and their supervising agencies." *Consumers Union*, 589 F.2d at 534. *See also* Lever Decl. at ¶ 15 ("OCIE depends on receiving cooperation to effectively and efficiently conduct the . . . examinations that are at issue here. In addition, OCIE relies on this cooperation to fulfill its oversight responsibilities generally, which affects the SEC's mission to effectively regulate the securities markets."). Yet,

though this secondary purpose may at times carry significant weight, when standing alone, it ought not thwart FOIA's broad overarching rule favoring disclosure, in all instances where a vaguely cooperative interest in the regulation of financial institutions is implicated. *See generally Dep't of Air Force v. Rose*, 425 U.S. 352, 353 (1976) ("The limited statutory exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant legislative objective of the FOIA.").

Our case law has oft repeated the mantra of Exemption 8's "all-inclusive" scope without fully considering the changed universe in which financial institutions operate. *Cf., e.g.*, *Pub. Citizen v. Farm Credit Admin.*, 938 F.2d 290, 291 (D.C. Cir. 1991); *Gregory v. FDIC*, 631 F.2d 896 (D.C. Cir. 1980). Our precedents serve to bolster and inform our conclusion—correct in light of the 2010 amendment—that even documents of potentially dubious relation to core "financial" data (i.e., arbitration program oversight records) necessarily fall within Exemption 8's ambit.

Yet, to the extent our case law fosters today's result, it bears questioning the wisdom of the course our precedents plot. The financial world has changed since the genesis of our Exemption 8 case law. So has the world in which our financial system operates. Financial institutions and their regulators now frequently operate under a haze of public distrust fueled by repeated regulatory failures and massive, opaque, and unaccountable bailouts. The public now has good reason to doubt the rigor of our financial systems' reliability and oversight.

The ramifications of Exemption 8's all-encompassing secrecy therefore reach far beyond PIABA's (legitimate) concern for the adequacy and fairness of FINRA's regime of

4

arbitration. It bodes ill for rebuilding civic trust that Exemption 8 could be employed to permanently shroud both the possible reckless conduct by regulated financial institutions and the particulars of sweeping agency intrusions into the sphere of the financial marketplace. *See, e.g.*, *Judicial Watch, Inc. v. U.S. Dep't of Treasury*, 796 F. Supp. 2d 13, 37–38 (D.D.C. 2011) (finding many documents relating to the Treasury's Troubled Asset Relief Program, and related agency investments, protected from disclosure by, among other things, Exemption 8).

"The fabric of [the] American empire ought to rest on the solid basis of the consent of the people." THE FEDERALIST NO. 22 (Alexander Hamilton). That at times delicate weave risks coming undone where vague principles of regulatory cooperation are allowed to inevitably trump the public's interest in transparency.

Congress should revisit this ill-conceived amendment and make sure an apparent miscue does not morph into a serious misadventure.