# Applicability of the Federal Advisory Committee Act to the National Endowment for the Humanities

The Federal Advisory Committee Act (FACA) requires that the names of members of the Humanities Panel of the National Endowment for the Humanities (NEH) be made available to the public by subgroup, but does not require that such disclosure occur until after the particular subgroup's work has been completed.

The privacy exemption to the open meeting requirement of the Government in the Sunshine Act, made applicable to federal advisory committees by the 1976 amendments to FACA, may permit closing some portions of meetings of subgroups of the Humanities Panel at which individual grant applications are discussed; however, the NEH has the responsibility to determine in advance what portions of subgroup meetings will not fall within an exemption to FACA's openness requirement, and to assure that those portions are closed to the public.

August 18, 1980

## MEMORANDUM OPINION FOR THE GENERAL COUNSEL, NATIONAL ENDOWMENT FOR THE HUMANITIES

This responds to your request for our advice regarding the Federal Advisory Committee Act (FACA).[1] This memorandum focuses on two issues: first, whether the FACA requires that the names of members of National Endowment for the Humanities (NEH) advisory committees and their subgroups be made available to the public, and if so, at what time; and second, whether the meetings of such committees could, in appropriate circumstances, be closed to the public in order to protect the privacy interests of applicants for financial assistance. We will discuss each issue in turn after setting forth the relevant facts.

### I. Background

The NEH has two advisory committees. The first is the National Council on the Humanities, created pursuant to §8 of the National Foundation on the Arts and Humanities Act, Pub. L. No. 89-209, 79 Stat. 845 (1965), as codified at 20 U.S.C. §957. The National Council advises the chairman regarding the Endowment's policies and procedures and regarding applications for financial assistance. The second advisory committee is the Humanities Panel, created by NEH and composed of hundreds of scholars and experts in various fields who

---

[1] Pub. L. No. 92-463, 86 Stat. 770 (1972), as amended by Pub. L. No. 94-409, §5(c), 90 Stat. 1247 (1976). The FACA is codified in 5 U.S.C. App.

meet in subgroups or panels to review and make recommendations regarding applications for financial assistance.[2]

Our understanding is that the NEH publishes the names of all Humanities Panel members without differentiating among the various subgroups. Also, we understand that when applicants seek information about their applications, the NEH may release to them the names of members of the reviewing panel, but only after the chairman has taken final action on applications considered by the panel.

We understand further that, as a rule, the NEH opens to the public those portions of National Council meetings at which the NEH's general policies, procedures, and practices are discussed. Portions of meetings of the National Council and the subgroups of the Humanities Panel that review applications for financial assistance, we understand, generally are *not* open to the public.

## II. Discussion

### 1. Membership of Advisory Committees

You have asked us whether the NEH's policies regarding disclosure of the names of members of the Humanities Panel are in accord with the FACA. This raises two subsidiary issues. First, does the FACA require the NEH to make available to the public not only the names of all of the members of the Humanities Panel, but also the names of the members of specific subgroups of the Panel that consider applications for financial assistance? Second, if there is any such requirement, at what point in the process should the NEH make these names public—at once, or after the subgroups have completed their work?

Although the FACA does not address these issues in specific terms, answers may be inferred from its associated requirements. First, the FACA does require the President annually to report to Congress on the activities and status of advisory committees. Among the items to be included in such reports is a list of "the names and occupations of . . . current members" of advisory committees. § 6(c). Although there is no similar requirement that the public be informed of the names of members of advisory committees, because Congress decreed that one of the purposes of the FACA was that "the Congress *and the public* should be kept informed with respect to the . . . membership . . . of advisory committees," § 2(b)(5) (emphasis added), the Act, in our view, contemplates that the names of members of advisory committees should also be made available to the public.[3]

---

[2] The word "panel" without capitalization refers to a subgroup of the larger Humanities Panel. The Humanities Panel comprises *all* who may potentially serve on subgroups or panels. The Humanities Panel numbers in the hundreds, while individual panels are composed of a few chosen experts.

[3] This inference is buttressed by the fact that the FACA requires that the membership of advisory committees be "balanced" in terms of the points of view represented on them. *See* §§ 5(b)(2) and (c). There would be no way for the public to monitor agency compliance with this requirement if the public were not able to know the identity of the membership of advisory committees.

Thus, the issue arises whether the NEH's policy of disclosing publicly the names of all members of the Humanities Panel is in compliance with the Act. Although there is no provision specifically rendering invalid such a practice, we believe that it would be more in keeping with the provisions and spirit of the FACA for the NEH to make available to the public the names of members of subgroups of the Humanities Panel as well as the names of members of the Humanities Panel as a whole. The reason for this is that the FACA expressly defines an "advisory committee" to include not only any committee, board, commission, council, conference, panel, task force, or other similar group, but also "any subcommittee or other subgroup thereof . . .", § 3(2), that otherwise meets the tests of an advisory body. Accordingly, subgroups of the Humanities Panel are advisory committees in their own right. For the public to be fully informed about the membership of each NEH advisory committee, therefore, the public should have access to information about the membership not only of the Humanities Panel as a whole, but also of each of its subgroups that functions independently as an advisory committee.[4]

The second question is whether the FACA requires that such disclosure occur at once—or at least as soon as or shortly after the subgroups of the Humanities Panel are constituted—or whether such disclosure may occur later in the process after the subgroups have completed their work and agency action on the applications has been taken. We find no requirements in the FACA that the NEH must make such disclosure at once or at any time before the subgroups have completed their work and the agency has taken action on the applications. Had Congress intended to impose such a requirement, it could easily have done so, such as in the provisions detailing the contents of charters to be filed before advisory committees may be established, see § 9(c), or of the notices of advisory committee meetings, see §10(a). These provisions are silent on the subject. Similarly, OMB Circular A–63 (Mar. 27, 1974), as amended, which implements the FACA and provides more detailed procedural guidance than the Act itself, does not require the NEH to disclose the membership of its Humanities Panel subgroups at any particular time. Indeed, the only provision of the FACA that speaks specifically about identifying the members of advisory committees (aside from the one discussed above dealing with annual reports to Congress) concerns the required contents of the minutes of advisory

---

[4] Without addressing in any detail the various ways in which such information could be made available to the public, we should note that such methods might include placing lists of the members of subgroups of the Humanities Panel in a file open to the public, or including such information in reports about the activities of NEH advisory committees. Cf. § 8.b(5) of the proposed joint Department of Justice-OMB guidelines on the FACA, published in 1973 at 38 Fed. Reg. 2308 (Jan. 23, 1973) (calling on agencies annually to prepare a report describing the membership, functions, and actions of its advisory committees; this proposed order was superseded by OMB Circular A–63, which contains no such specific requirement that advisory committee membership be annually reported).

committee meetings,[5] which are, of their very nature, only made available to the public, if at all, after the work of committees has been completed. Since *both* situations in which Congress specifically requires disclosure of the names of committee members, or at least of those present at meetings, are ones that would lead to public disclosure, if ever, only after advisory committee meetings have been completed, we consider that the Act cannot fairly be read to impose any more stringent requirement in this case.

## 2. Closing Advisory Committee Meetings

You have asked whether the NEH could invoke, as the basis for closing meetings at which applications for financial assistance are reviewed, the sixth of the applicable Government in the Sunshine Act exemptions from the open meeting requirement. *See* 5 U.S.C. § 552b(c)(6). The exemption pertains to information likely to:

> . . . disclose information of a personal nature where disclosure would constitute a clearly unwarranted invasion of personal privacy . . . .

With the *caveats* noted below, our answer is yes.[6]

As a preliminary matter, the FACA's legislative history makes plain that the Act's "standard of openness . . . is to be liberally construed." S. Rep. No. 1098, 92d Cong., 2d Sess. 14 (1972); *see also* H.R. Rep. No. 1017, 92d Cong., 2d Sess. (1972); H.R. Conf. Rep. No. 1403, 92d Cong., 2d Sess. (1972). Courts have underscored that ". . . when a federal executive official utilizes an advisory committee to assist him in discharging his responsibilities, in most instances he must do so openly and publicly." *Center for Auto Safety* v. *Cox*, 580 F. 2d 689, 694 (D.C. Cir. 1978); *see also Food Chemical News, Inc.* v. *Davis*, 378 F. Supp. 1048, 1051 (D.D.C. 1974). Further, one of the main reasons for the 1976 amendment of the FACA making the Sunshine Act's (instead of the FOIA's) exemptions from the open-meeting requirement applicable to advisory committees was to eliminate FOIA exemption (b)(5)[7] as a basis for closing advisory committee meetings. As the conference report underscored, the amendment was intended ". . . to end agency reliance upon the 'full and frank' discussion rationale for closing advisory committee meetings." H.R. Rep. No. 1441, 94th Cong., 2d Sess. 26 (1976). Thus, to invoke a Sunshine Act exemption, a more specific justification must be found to exist than merely a generalized need to protect candor in advisory committee deliberations.

---

[5] *See* § 10(c) of the FACA, which requires that advisory committee minutes include, *inter alia,* "a record of the persons present . . . ."

[6] We do not discuss here the procedural steps that must be taken before the NEH may close an advisory committee meeting. *See* OMB Circular A-63.

[7] That exemption pertains to "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."

The privacy exemption to the open meeting requirement calls for an assessment whether the topic of discussion is of a "personal" or private nature and, second, whether in the particular case the topic is so personal that its disclosure would be a "clearly unwarranted" invasion of an individual's privacy interests. The latter determination requires a weighing of the interests in privacy against the interests in disclosure. *See* H.R. Rep. No. 880, Pt. I, 94th Cong., 2d Sess. 11 (1976); *see also* Note, *The Government in the Sunshine Act—an Overview*, 1977 Duke L.J. 565, 577-78.[8]

The subjects to be discussed with respect to applications for financial assistance could well include, for example, an applicant's abilities in his field, his reputation among his colleagues, and his professional background and performance. These topics would certainly appear to involve the type of personal information in which an applicant has a privacy interest. Support for that view derives from S. Rep. No. 354, 94th Cong., 1st Sess. 21 (1975), which states that the forerunner to this exemption "may" apply to "a discussion of an individual's drinking habits or health, *or review of a grant application which requires assessing an individual's professional competence*" (emphasis added). The House Government Operations Committee report notes that the exemption would apply, for instance, to discussions of an individual's health or alleged drinking habits. *See* H.R. Rep. No. 880, Pt. I, 94th Cong., 2d Sess. 11 (1976). It seems plain that just as discussing a person's health could reveal highly personal matters as to which an individual has a strong privacy interest, so too could discussing a scholar's competence, a researcher's reputation, or an applicant's ability to carry through a project that he starts—which, again, are precisely the types of matters that may be crucial in reviewing applications for financial assistance. *Cf. Washington Research Project, Inc.* v. *Dept. of HEW*, 366 F. Supp. 929, 937 (D.D.C. 1973), *aff'd on other grounds*, 504 F.2d 238 (D.C. Cir. 1974), *cert. denied*, 421 U.S. 963 (1975).

But the fact that an applicant has a legitimate privacy interest in a closed committee meeting does not end the inquiry. The agency must also determine that the privacy interest is not *de minimis* and is not outweighed by countervailing interests in openness.[9]

---

[8] The balancing analysis required under the Sunshine Act's privacy exemption, 5 U.S.C. § 552b(c)(6), is essentially similar to that required under the privacy exemption of the Freedom of Information Act, 5 U.S.C. § 552(b)(6) except that the latter, dealing with records involves the additional issue whether a document is the type of "file" covered by the exemption. *See generally* S. Rep. No. 354, 94th Cong., 1st Sess. 3 (1975); H.R. Rep. No. 880, Pt. I, 94th Cong., 2d Sess. 15 (1976); Marblestone, *The Relationship Between the Government in the Sunshine Act and the Federal Advisory Committee Act*, 36 Fed. Bar J. 65, 67 and n. 16 (1977).

[9] The legislative history of the amendment of the FACA making the Sunshine Act's exemptions applicable to advisory committee meetings indicates Congress' acceptance of the principle that "peer review" processes may have to be closed to protect legitimate privacy interests, although the competing interest in openness must be weighed against the privacy interests. *See* H.R. Conf. Rep. No. 1441, 94th Cong., 2d Sess. 26 (1976): "The conferees . . . are concerned about the possible effect of this amendment upon the peer review and clinical trial preliminary review systems of the National

Continued

In the present context, for instance, it might be known in advance that an NEH advisory committee will consider as factors in the award of assistance such subjects as the geographical location of academic institutions with which applicants are affiliated. If this were known, the agency would be under an obligation to consider whether such a discussion could be isolated from other subjects of a more personal nature. If it could be, the NEH should open to the public such portions of committee deliberations that do not seriously implicate applicants' interests in protecting from public view intimate facts about themselves. Opening such portions of committee meetings would serve the same important aim of allowing the public to be informed about criteria for awarding financial assistance as is served by opening the National Council's policy discussions, which, we understand, already is done. There is no more justification for closing to the public such discussions when they occur in subgroups of the Humanities Panel than there is when they occur in the National Council.

At the same time, we recognize that in the advisory committee context, and particularly when dealing with the review of individuals' applications for financial assistance, it may be difficult if not impossible to segregate in advance all of the policy-oriented, nonprivate topics from the particularized, highly private subjects. This may be so simply because, in a meeting, tight controls on the development of discussion are difficult to impose. For instance, in policy discussions that are open to the public, committee members may wish on occasion to comment on highly private matters pertaining to applicants. Conversely, in nonpublic discussions of applications subject to the privacy exemption, members may raise topics implicating no real privacy concerns. While these observations militate against an inflexible or impractical rule in this context, it should nonetheless be borne in mind that under the FACA, the NEH has the responsibility to seek in advance to determine what portions of advisory committee meetings will not fall within the specified exemptions from the openness requirement, and to ensure that those portions are not closed to the public.

LEON ULMAN
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

Institutes of Health. The conferees thus wish to state as clearly as possible that personal data, such as individual medical information, is especially sensitive and should be given appropriate protection to prevent clearly unwarranted invasions of individual privacy. While the conferees are sympathetic to the concerns expressed by NIH . . . , the conferees are equally sympathetic to concerns expressed by citizens' groups that important fiscal and health-related information not be unnecessarily withheld from the public." *See also* H.R. Rep. No. 880, Pt. II, 94th Cong., 2d Sess. 11 (1976); Note, *Government in the Sunshine Act: Opening Federal Agency Meetings,* 26 Am.U.L.Rev. 154, 182–83 (1976). *Cf. Ditlow* v. *Shultz,* 517 F.2d 166, 169–170 (D.C. Cir. 1975) (speaking of the privacy interests protected by the FOIA, which include, *inter alia,* matters of reputation, and which must be balanced against interests in disclosure).